ORDERED.

Dated: March 29, 2024

_____
Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | ) |
| | ) |
| Nadira Lekhraj, | ) Case No. 6:22-bk-01524-LVV |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| Jaspup Property Holdings, LLC and Mahendra Ramsarup, | ) Adv. No. 6:22-ap-00069-LVV |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Nadira Lekhraj, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

All debtors are required to file schedules of assets and liabilities ("Schedules") and a Statement of Financial Affairs ("SOFA"). These disclosures are critical to the bankruptcy process for they inform the Court and creditors of a debtor's financial status and history. Full and voluntary disclosure is required. Without full disclosure, the bankruptcy process is unworkable. For that

1

reason, debtors sign the Schedules and SOFA under penalty of perjury, and failure to make the required disclosures is a basis to deny a debtor's discharge.

Here, Mahendra Ramsarup and Jaspup Property Holdings, LLC[1] ("Ramsarup" and "Jaspup" respectively or collectively referred to as "Plaintiffs") seek to deny Nadira Lekhraj ("Debtor" or "Defendant") her discharge for failure to disclose various assets and transactions in her Schedules and SOFA. Debtor argues she made a mistake and had no fraudulent intent. After considering the evidence and testimony at trial[2] and post-trial memoranda,[3] the Court concludes that the Debtor knowingly and fraudulently failed to make required disclosures, and for that reason she is denied a discharge under 11 U.S.C. § 727(a)(4)(A).[4] Finding that the Debtor is denied a discharge under § 727(a)(4)(A), the Court need not reach a decision on the remaining counts of the Complaint.[5]

## **Factual Findings**

Debtor learned of an investment opportunity with Avinash Singh ("Singh") through a flyer at a restaurant called GT Roti Shop.[6] She had already heard of Singh; both were of Guyanese descent, and Debtor had seen Singh perform at a concert.[7] After seeing the flyer, Debtor called Singh to discuss investing with him and after a discussion, invested $350,000 with Singh through his company, Highrise Advantage, LLC.[8] Singh promised a 6% monthly return on the investment.[9] Singh also promised Debtor a 3% monthly return for any clients she brought in.[10] Singh provided

---

[1] Mahendra Ramsarup testified as the corporate representative for Jaspup.
[2] The trial was held on July 19, 2023.
[3] Doc. Nos. 45 and 46.
[4] Unless specified otherwise, all references to statutory sections refer to Title 11 of the United States Code.
[5] Plaintiffs also seek to deny Debtor her discharge under § 727(a)(2),(a)(3), and (a)(5) and seek to declare their debt non-dischargeable under § 523(a)(2)(A),(a)(4) and (a)(19).
[6] Doc. No. 47. 7/19/23 Trial Tr. 74:15-25.
[7] Doc. No. 47. 7/19/23 Trial Tr. 75:3-20.
[8] Doc. No. 47. 7/19/23 Trial Tr. 76:20-77:13.
[9] Doc. No. 47. 7/19/23 Trial Tr. 81:21-82:8.
[10] *Id.*

Debtor with a form agreement to use with clients and promised he would pay 6% for these investments, 3% to Debtor and 3% to the new client.[11]

Happy with their investment with Singh, Debtor and her husband approached Ramsarup, their nephew, with what they advertised as an investment opportunity through Lekhraj Investments 2, LLC ("Lekhraj Investments"), a company 100% owned by Debtor.[12] Debtor provided Plaintiffs with identical written agreements, the ones prepared by Singh, where Lekhraj Investments would "invest" any sums of money advanced by Plaintiffs.[13] Ramsarup signed the agreement with Lekhraj Investments on May 11, 2020 and invested $30,000.[14] Jaspup signed an identical agreement on June 7, 2020 and invested a total of $800,000.[15] While the agreement mentions an investment, neither Lekhraj Investments nor the Debtor actually invested Plaintiffs' funds.[16] Instead, Debtor turned over the $830,000 to Singh and his company.[17] Soon after Plaintiffs invested with Lekhraj Investments, they unsuccessfully tried to withdraw funds and found that all their money was lost to a Ponzi scheme perpetrated by Singh through his company.[18] Debtor also lost approximately $150,000 of her own investment.[19]

On April 27, 2022, Debtor filed a Petition for relief under Chapter 7 of the Bankruptcy Code.[20] Debtor listed no ownership of vehicles in her Schedules.[21] Debtor did not list any source

---

[11] Doc. No. 47. 7/19/23 Trial Tr. 50:19-25; 82:4-8.
[12] Doc. No. 47. 7/19/23 Trial Tr. 36:4-14; 46:24-47:2; 86:23-87:14; 110:13-14.
[13] The agreement also noted that Debtor would cover any losses. Doc. No. 47. 7/19/23 Trial Tr. 25:21-26:3; 50:19-25; 51:12-22. *See also*, Pl.'s Ex. 2 and 3.
[14] Doc. No. 47. 7/19/23 Trial Tr. 25:5-13. *See also*, Pl.'s Ex. 4.
[15] Jaspup initially invested $300,000 and then an additional $500,000. Doc. No. 47. 7/19/23 Trial Tr. 26:14-27:7. *See also,* Pl.'s Ex. 5 and 6. The transfers were made from Harbor Land Title to Lekhraj Investments as a loan to Jaspup. Doc. No. 47. 7/19/23 Trial Tr. 39:19-40:1.
[16] Doc. No. 47. 7/19/23 Trial Tr. 89:11-17.
[17] *Id.* There is contradictory testimony about whether Plaintiffs were made aware by Debtor that their money would be turned over to Singh to invest. *Compare* Doc. No. 47. 7/19/23 Trial Tr. 27:18-28-11 (Plaintiffs' version) *with* Doc. No. 47. 7/19/23 Trial Tr. 50:21-25; 54:1-5; 87:3-19; 101:14-102:4 (Debtor's version).
[18] Doc. No. 47. 7/19/23 Trial Tr. 28:12-29:13; 56:9-19.
[19] Doc. No. 47. 7/19/23 Trial Tr. 63:2-4; 83:18-20.
[20] Main Case, Doc. No. 1.
[21] Main Case, Doc. No. 1.

of income apart from her wages and retirement distribution in her Schedules or SOFA.[22] Plaintiffs assert that Debtor failed to include the following interests of property and income on her Schedules and SOFA: (1) the sale of real property located at 785 Royal Palms Dr., Kissimmee, Florida 34743 (the "Royal Palms Property"); (2) a 2020 BMW X5 (the "BMW") and associated rental income, (3) a 2020 Toyota 4Runner (the "Toyota") and associated rental income; and (4) a contract to purchase real property located at 1162 Pando Loop (the "Pando Loop Property") and an associated deposit. The Court will address each non-disclosure below including Debtor's explanation, if any, for the non-disclosure.

Royal Palms Property

Debtor and her husband jointly purchased the Royal Palms Property, a non-homestead real property, in 2003 for $85,500 by taking an equity loan on their home.[23] They sold the Royal Palms Property on October 16, 2020 for $195,000, resulting in a gross profit of $109,500.[24] Debtor used the profit to pay off the equity loan on their home.[25] At the time of the sale, Debtor was aware that she had lost Plaintiff's money to Singh's Ponzi scheme.[26]

In Part 7 of the SOFA, debtors must disclose whether they sold, traded, or otherwise transferred any property to anyone other than property transferred in the ordinary course of business within two years from filing of the bankruptcy.[27] Moreover, Part 2 of the SOFA requires debtors to disclose any income they received during the year of the bankruptcy filing and the two previous calendar years.[28] The Court finds Debtor was required to disclose the sale of the Royal Palms Property in her SOFA and the income therefrom because the sale occurred within two years

---

[22] Main Case, Doc. No. 1.
[23] Doc. No. 47. 7/19/23 Trial Tr. 63:20-23; 64:5-15. *See also*, Pl.'s Ex. 11 and 12.
[24] Doc. No. 47. 7/19/23 Trial Tr. 64:3-18.
[25] Doc. No. 47. 7/19/23 Trial Tr. 54:12-15.
[26] Doc. No. 47. 7/19/23 Trial Tr. 64:16-22.
[27] Main Case, Doc. No. 1.
[28] Main Case, Doc. No. 1.

of the filing of her bankruptcy. Debtor did not provide any explanation as to why the sale was not disclosed in her SOFA.

BMW

Debtor admits she holds a 50% ownership interest in the BMW with her daughter owning the remaining 50%.[29] Both Debtor and her daughter are listed on the title.[30] Debtor made payments related to the BMW but was sometimes reimbursed for those payments by her daughter.[31] Debtor and her daughter both drove the BMW.[32] Debtor also rented the BMW to third-parties through Turo.[33] Debtor rented the BMW through Turo a total of 37 times starting from November 1, 2020 and continuing after the bankruptcy filing to May 6, 2022 with payments deposited into Debtor's Wells Fargo bank account.[34] The rental was listed on Turo as "Nadira's BMW" with a pick-up location of Debtor's home address.[35]

In Schedule A/B, debtors must list any vehicles they "own, lease, or have a legal or equitable interest in."[36] This includes "any vehicles you own that someone else drives."[37] Despite her ownership interest in the BMW, Debtor did not list such interest in her Schedules, nor did she list income generated from the Turo rentals in her Schedules or SOFA. The Court finds that Debtor was required to list the BMW and any rental income therefrom in her Schedules and SOFA.

---

[29] Doc. No. 47. 7/19/23 Trial Tr. 62:8-12.
[30] *See* Pl.'s Ex. 20.
[31] There was some sort of mixed payment arrangement. Debtor made payments when her daughter was a student but also afterwards when the daughter experienced financial difficulties. It is unclear to what extent each party was contributing to payments. Doc. No. 47. 7/19/23 Trial Tr. 92:3-15; 105:3-5; 128:12-129:6.
[32] There is conflicting evidence about who was the primary driver of the BMW. Ramsarup testified that he had known Debtor to drive the BMW. Debtor testified that her daughter was the primary driver, but her daughter gave her the car to use at some point. Debtor's daughter testified that she was the primary driver initially but that once her job changed to a remote position, she would let Debtor use the car. Doc. No. 47. 7/19/23 Trial Tr. 16:15-18; 31:3-8; 93:5-8; 129:7-19. The Court does not have sufficient evidence to make a determination on the primary driver.
[33] Turo allows individuals to rent their vehicles to others through their website similar to how a person would rent their home on Airbnb. Doc. No. 47. 7/19/23 Trial Tr. 66:23-68:2.
[34] *Id. See also*, Pl.'s Ex. 15, 16, 17, 18, and 19.
[35] Doc. No. 47. 7/19/23 Trial Tr. 65:5-7. *See also*, Pl.'s Ex. 13.
[36] Main Case, Doc. No. 1.
[37] Main Case, Doc. No. 1.

Debtor testified she did not include her interest in the BMW in her Schedules because she considered it her daughter's vehicle.[38] She testified that she co-signed for the BMW only to help her daughter qualify for financing the purchase.[39] Debtor does not offer an explanation for why the rental income from Turo was not listed in her Schedules or SOFA.

Toyota

Debtor's husband owned the Toyota for approximately three months starting in late 2020.[40] At one point, Debtor listed the Toyota on Turo as "Nadira's Toyota."[41] However, Plaintiffs provided no evidence that Debtor held a legal or equitable interest in the Toyota. Moreover, despite the Toyota being listed on Turo, no rental income was generated from the Toyota.[42] As such, the Court finds Debtor was not required to list the Toyota or income therefrom in her Schedules.

Pando Loop Property

Prepetition, Debtor and her husband entered into a contract to purchase real property located at 1110 Windlass Court for $463,600.[43] Debtor personally paid a $6,000 deposit, and Lekhraj Investments paid a deposit of $11,547.[44] Debtor's husband paid a $40,000 deposit.[45] The contract was cancelled, and the entire deposit of $57,547 was returned to Debtor's husband.[46] Debtor and her husband then entered into a new contract to purchase the Pando Loop Property for $515,590.[47] Debtor's husband paid the deposit on the Pando Loop Property of $57,113, which represented the returned deposit from the previously cancelled contract.[48]

---

[38] Doc. No. 47. 7/19/23 Trial Tr. 93:2-8.
[39] Doc. No. 47. 7/19/23 Trial Tr. 104:2-10.
[40] Doc. No. 47. 7/19/23 Trial Tr. 66:13-15.
[41] Doc. No. 47. 7/19/23 Trial Tr. 65:21-24. *See also*, Pl.'s Ex. 14.
[42] Doc. No. 47. 7/19/23 Trial Tr. 66:2-9.
[43] Doc. No. 47. 7/19/23 Trial Tr. 68:21-25. *See also,* Pl.'s Ex. 21.
[44] Doc. No. 47. 7/19/23 Trial Tr. 69:1-8; *See also*, Pl.'s Ex. 22.
[45] Doc. No. 47. 7/19/23 Trial Tr. 69:11-13; *See also*, Pl.'s Ex. 22.
[46] Doc. No. 47. 7/19/23 Trial Tr. 69:14-25; *See also*, Pl.'s Ex. 23 and 24.
[47] Doc. No. 47. 7/19/23 Trial Tr. 70:6-25; *See also,* Pl.'s Ex. 25.
[48] Debtor's husband admitted that he used the returned deposit from the cancelled contract to pay the deposit on the Pando Loop Property. Doc. No. 47. 7/19/23 Trial Tr. 71:1-7; 118:25-119:12; *See also*, Pl.'s Ex. 26 and 27.

Prepetition, Debtor and her husband amended the contract twice: first to change the method of payment from financing to cash and second to add their daughter and son-in-law as buyers and switch the method of payment back to financing.[49] On May 6, 2022, only nine days after her bankruptcy case was filed, the contract was amended a third time to remove the Debtor's name as a buyer.[50] On June 24, 2022, Debtor's husband, daughter, and son-in-law closed on the Pando Loop Property for $542,600.[51] A few months later, the property sold for $630,000.[52] Despite the sale price exceeding the purchase price, Debtor and her husband testified that the property was sold for a loss because of improvements and carrying costs.[53] Debtor admitted, however, that her husband recovered the deposit, and no portion was returned to her or the estate.[54]

Schedule A/B requires debtors to disclose any legal or equitable interests in real property and any security deposits or prepayments.[55] Additionally, Schedule G requires debtors to list any executory contracts.[56] Debtor testified she did not include her interest in the contract or the deposit because she considered herself disqualified from purchasing the Pando Loop Property.[57] Debtor testified that she and her husband intended to finance the purchase of the Pando Loop Property; however, once both of them were unable to qualify for a mortgage, they added their daughter and son-in-law to help qualify for the loan.[58] The Court finds Debtor should have listed her deposit of $17,547 on the Pando Loop Property and her interest in the contract to purchase the Pando Loop Property in her Schedules.

---

[49] Doc. No. 47. 7/19/23 Trial Tr. 71:8-72:3. *See also*, Pl.'s Ex. 28 and 29.
[50] Doc. No. 47. 7/19/23 Trial Tr. 72:7-11. *See also*, Pl.'s Ex. 30.
[51] Doc. No. 47. 7/19/23 Trial Tr. 72:12-18. *See also*, Pl.'s Ex. 31.
[52] Doc. No. 47. 7/19/23 Trial Tr. 72:12-18. *See also*, Pl.'s Ex. 31.
[53] Doc. No. 47. 7/19/23 Trial Tr. 72:19-73:1; 114:21-115:8; 119:18-23.
[54] Doc. No. 47. 7/19/23 Trial Tr. 73:3-13.
[55] Main Case, Doc. No. 1.
[56] Main Case, Doc. No. 1.
[57] Doc. No. 47. 7/19/23 Trial Tr. 72:4-6.
[58] Doc. No. 47. 7/19/23 Trial Tr. 70:17-20; 71:20-72:3; 120:13-121:1.

7

**Legal Analysis**

Section 727(a) provides a "court shall grant the debtor a discharge…unless" the debtor committed one of the specific actions enumerated. "The Bankruptcy Code favors discharge of an honest debtor's obligations." *In re Jennings*, 533 F.3d 1333, 1338 (11th Cir. 2008). Generally, objections to discharge are construed liberally for the honest debtor and strictly against the objecting creditor. *Id. See also In re Coady*, 588 F.3d 1312, 1315 (11th Cir. 2009). Courts recognize that "[t]he reasons for denying a discharge… must be real and substantial, not merely technical and conjectural." *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994) (quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987)). To prevail, Plaintiffs must prove their objection to discharge by a preponderance of the evidence. Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 289-91 (1991). Once Plaintiffs have met their burden, "[t]he debtor must bring forward enough credible evidence to dissuade the court from exercising its jurisdiction to deny the debtor discharge based on the evidence presented by the objecting party." *In re Jennings*, 533 F.3d at 1339 (quoting *In re Prevatt*, 261 B.R. 54, 58 (Bankr. M.D. Fla. 2000)).

Section 727(a)(4)(A) allows the court to deny the debtor a discharge when the debtor "knowingly and fraudulently, in or in connection with the case … made a false oath or account." To justify denial of the debtor's discharge for a false oath, the false oath must be "fraudulent and material." *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991). The debtor's fraudulent intent is typically inferred by examining the totality of the circumstances. *In re Wright*, 618 B.R. 569, 574-75 (Bankr. M.D. Fla. 2020). An oath is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984) (per

curiam). "A knowing and fraudulent omission from a sworn Statement of Affairs or schedule may constitute a false oath." *Id*., at 618 n.3.

The Court finds the requisite fraudulent intent with Debtor's omissions. Debtor failed to list several property interests and transactions and provides little, if any, explanation for the omissions. The disclosures were clearly required. One of these omissions alone might not be sufficient to conclude they were fraudulent and material, but these omissions taken together lead the Court to this conclusion.

The most glaring omission is the BMW. Debtor claims she did not list the BMW in her Schedules because she considered it her daughter's car despite admitting she is listed on the title. The Court does not find this explanation to be credible. Ramsarup, who as the Debtor's nephew would be familiar with the Debtor's lifestyle, testified he had known the Debtor to drive her own car, the BMW. Even though Debtor was sometimes reimbursed by her daughter, Debtor was the one directly making payments for the BMW. Additionally, the BMW was listed as "Nadira's BMW" on Turo with a pick-up location of Debtor's address and the rental income from Turo was deposited into Debtor's bank account.[59] Debtor was also a co-owner with her daughter of another car, a 2017 Infiniti Q60 (the "Infiniti"), which she also testified she considered her daughter's car.[60] The Court finds it incredulous that Debtor would consider both cars as belonging to her daughter when Debtor used and paid expenses of the BMW.

Furthermore, Debtor disclosed the Infiniti in her Schedules and SOFA.[61] In her Schedule D, she listed a secured claim on the Infiniti with a note, "Vehicle belongs to daughter."[62] In part 9 of her SOFA, Debtor listed the Infiniti as "property you hold or control for someone else," noting,

---

[59] Debtor's daughter was not residing with Debtor. Doc. No. 47. 7/19/23 Trial Tr. 107:2-7.
[60] Doc. No. 47. 7/19/23 Trial Tr. 61:20-24; 104:8-10; 130:16-18.
[61] Main Case, Doc. No. 1.
[62] Main Case, Doc. No. 1.

"Debtor financed vehicle in her name because daughter had not established credit. Daughter has made all payments. Debtor has not put any money into the vehicle."[63] If Debtor believed only vehicles that she owned 100% needed to be included in her Schedules or SOFA, it follows that Debtor should not have included information about the Infiniti. Moreover, Debtor collected rent from the BMW on a rental that ended on April 25, 2022, only two days before the bankruptcy filing, and post-petition on another rental that ended on May 9, 2022.[64] Debtor's collection of rental income from the BMW so close in time to her bankruptcy filing suggests she was very much aware of this income and her interest in the BMW when preparing her Schedules and SOFA. Thus, the Court infers Debtor acted with fraudulent intent with respect to the omission of information about the BMW and associated rental income from Turo in her Schedules and SOFA.[65]

Debtor's explanation about the Pando Loop Property is also unavailing. Debtor's testimony that she deemed herself disqualified and therefore need not include the contract in her Schedules was not credible. It is plausible that Debtor added her daughter and son-in-law to the contract to help qualify for a loan. However, after the daughter and son-in-law were added to the contract through the second amendment, the issue of qualification for the mortgage should have been resolved. Yet when the contract was amended a third time shortly after Debtor's bankruptcy, Debtor's husband remained on the contract while Debtor was removed even though Debtor's husband testified that he also could not qualify for a loan.[66] At this point, Debtor knew she was in bankruptcy. She also knew that she had an interest in this property, which was viewed as an

---

[63] Main Case, Doc. No. 1.
[64] *See* Pl.'s Ex. 15.
[65] The Debtor testified that she discussed her interest in the BMW at her section 341 meeting of creditors. Doc. No. 47. 7/19/23 Trial Tr. 61:13-19; 67:17-20; 94:12-15. Debtor's Schedules, however, were never amended, and it is unclear if the Turo rentals were also discussed at the meeting. No transcript of the section 341 meeting was admitted into evidence. The Court, therefore, does not find sufficient evidence to demonstrate that the disclosure at the section 341 meeting negated Debtor's fraudulent intent or that such non-disclosure was cured.
[66] Doc. No. 47. 7/19/23 Trial Tr. 120:13-121:1.

investment.⁶⁷ By removing her name from the contract and not disclosing any interest related to the Panda Loop Property on her Schedules, the Court infers Debtor fraudulently intended to shield her interest in the Pando Loop Property from her bankruptcy.

Furthermore, Debtor provided no explanation about why the sale of the Royal Palms Property was not included in her SOFA. Debtor did admit that the sale occurred after she learned about the Ponzi scheme and that she used the proceeds to pay off the lien on her home, resulting in a debt-free exempt asset. With no explanation offered for the non-disclosure and the proceeds from the sale being used to pay off the lien on their homestead, an exempt asset, the Court finds evidence of fraudulent intent with respect to this omission.

Based on the totality of circumstances, the Court finds Plaintiffs have met their burden in demonstrating Debtor had the requisite fraudulent intent with respect to the omissions on her Schedules and SOFA and that Debtor did not bring forward sufficient credible evidence to dissuade the Court otherwise. Moreover, even if, as Debtor contends, the undisclosed property did not benefit the estate, the non-disclosures are still material. While any one of these non-disclosures standing alone might not be sufficient, taken together, these failures indicate a pattern to avoid the impact of bankruptcy. Through her Schedules and SOFA, Debtor painted a picture of a debtor who lives primarily off wages with very few assets not even a vehicle. What was lost from this picture is that Debtor was a co-owner of a luxury vehicle and was involved in making investments through real estate transactions albeit on a small scale. It is no defense that the investments ended up being worthless, as it was up to the trustee and creditors to determine its value to the estate. *See In re Chalik* 748 F.2d at 618 ("The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a

---

⁶⁷ Doc. No. 47. 7/19/23 Trial Tr. 119:5-12.

worthless business relationship or holding…Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them."). Thus, even if the Debtor's claim that the Pando Loop Property was sold for a loss is accepted by this Court, information about the Debtor's interest in the Pando Loop Property would have provided insightful information to the trustee and creditors about its value to the estate.

## **Conclusion**

Plaintiffs have met their burden of demonstrating that Debtor knowingly and fraudulently made a false oath or account. The Court does not find Debtor's explanations for her omissions of the income from the Royal Palms Property, the BMW and associated rental income, and her interest in the Pando Loop Property to be credible. A separate Final Judgment consistent with this Memorandum Opinion will be entered in favor of Plaintiffs on count VI of the complaint and against the Debtor. The Debtor is not entitled to a discharge.